IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Laura L. Oliveira, ) | C/A No. 0:10-537-RMG-PJG |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

  This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 DSC et seq. The plaintiff, Laura L. Oliveira ("Oliveira"), brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the defendant, Commissioner of Social Security ("Commissioner"), denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

  In June 2006, Oliveira applied for SSI and DIB. Oliveira's applications were denied initially and on reconsideration and she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on February 19, 2009 at which Oliveira appeared and testified and was represented by Patricia Ferguson, Esquire. After hearing testimony from a vocational expert, the ALJ issued a decision dated June 1, 2009 finding that Oliveira was not disabled. (Tr. 9-20.)

  Oliveira was born in 1972 and was 36 years old at the time of the ALJ's decision. (Tr. 25.) She has a high school education and past relevant work experience as a secretary. (Tr. 25, 207.) Oliveira alleges disability since October 10, 1999[1] due to bipolar disorder. (Tr. 206.)

---

[1] Oliveira initially alleged disability beginning in October 2000, but requested to amend her alleged onset date at the hearing before the ALJ to October 10, 1999. (Tr. 27-28.)

The ALJ made the following findings and conclusions:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2005.

2. The claimant has not engaged in substantial gainful activity since October 10, 1999, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

   \* \* \*

3. The claimant has the following severe impairments: bipolar disorder and obesity (20 CFR 404.1520(c) and 416.920(c)).

   \* \* \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

   \* \* \*

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following mental limitations: the claimant is able to understand and remember short and simple instructions and is capable of performing simple tasks for two plus hours without special supervision. She is capable of maintaining a regular work schedule, but may miss an occasional work day due to depression. She can make simple work-related decisions, request assistance from others, use available transportation and adhere to basic standards of hygiene and safety. The claimant should have no interaction with the public and only occasional interaction with co-workers and supervisors, but can work in proximity to all of these individuals throughout the workday.

   \* \* \*

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

   \* \* \*

7. The claimant was born on [REDACTED], 1972, and was 27 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because the claimant is limited to performing unskilled work (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

\* \* \*

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 10, 1999, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-19.)

Oliveira filed an appeal and submitted additional evidence for consideration, which the Appeals Council admitted into the administrative record. The Appeals Council denied Oliveira's request for review on January 29, 2010, making the decision of the ALJ the final action of the Commissioner. (Tr. 1-4.) This action followed.

## SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 423(d)(1)(A), (d)(5) and § 1382c(a)(3)(H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); see also Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1973). The regulations require the ALJ to consider, in sequence:

(1) whether the claimant is engaged in substantial gainful activity;

(2) whether the claimant has a "severe" impairment;

(3) whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), and is thus presumptively disabled;

(4) whether the claimant can perform [her] past relevant work; and

  (5)  whether the claimant's impairments prevent [her] from doing any other kind of work.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. Id.

  Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform alternative jobs that exist in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); see also McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980). The Commissioner may carry this burden by obtaining testimony from a vocational expert. Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

## STANDARD OF REVIEW

  Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Thus, the court may review only whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589. In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Id. Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence. Blalock, 483 F.2d at 775.

## ISSUES

Oliveira raises the following issues for this judicial review:

I.  The ALJ erred in applying the wrong legal standard with regard to failure to follow medical advice.

II. The ALJ violated the treating physician rule.

III. The ALJ improperly found substantial numbers of jobs based upon an RFC finding which was inconsistent with the hypothetical presented to the Vocational Expert.

IV. The ALJ erred in determining the plaintiff's residual functional capacity pursuant to Social Security Ruling 96-8p.

V.  The ALJ erred in evaluation of pain.

(Pl.'s Br., ECF No. 13.)

## DISCUSSION

**A.    Relevant Medical Background**

In evaluating Oliveira's allegations of error the following medical history is relevant. Dr. Stefan Lerner diagnosed Oliveira with postpartum depression in November 1999 and treated her until October 2000. (See generally Tr. 141-51, 173-76, 183-201.) In February 2001, Oliveira was referred to Dr. Joseph Rockford, a psychiatrist, for examination, which revealed that she was oriented with intact memory and no thought disorder, hallucination, or delusions. (Tr. 435-36.) Dr. Rockford diagnosed Oliveira with major depression and saw her for follow-up visits in March, April,

and May of 2001. (Tr. 434, 436.) Dr. Rockford completed a form for Oliveira's disability carrier, reporting that she was "suffering from severe depression with total loss of motivation and energy and impaired concentration." (Tr. 431-32.) Dr. Rockford opined that Oliveira could not work and was "[t]otally disabled at this time." (Tr. 432.)

In September 2001, Dr. Colleen McLemore, a psychiatrist, examined Oliveira for two one-hour periods on September 10 and September 12. (Tr. 255-62.) The mental status examination appears to indicate that Oliveira displayed hopelessness, helplessness, suicidal ideation, and possibly delusions. (Tr. 261-62.) With regard to cognitive function, Dr. McLemore found that Oliveira's insight and judgment were impaired and that she was afraid of making a decision. (Tr. 262.) Dr. McLemore diagnosed Oliveira with severe major depressive disorder and the possibility of bipolar disorder, and assessed a current global assessment of functioning ("GAF") score of 45-50 with the highest GAF for the past year being 70.[2] (Tr. 262.) Dr. McLemore continued to treat Oliveira through December of 2001. (Tr. 249-54.) During that time, Oliveira's complaints appear to include reports that all she does is sleep (Tr. 253, 254); that she is "doing really, really, really bad" and wishes for her and her baby to die (Tr. 253); and that she is really tired but relieved that her son is with her "in-laws" (Tr. 251). (See also Tr. 443 (describing Oliveira's impairments)). Further, in October 2001, Dr. McLemore stated that Oliveira was anxious and depressed with suicidal thoughts

---

[2] The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fourth edition ("DSM-IV"), contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning. According to the DSM-IV, a GAF score between 41 and 50 may reflect "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." Id. at 34. Further, a GAF score between 61 and 70 may reflect "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." Id. A GAF score may reflect the severity of symptoms or impairment in functioning at the time of the evaluation. Id. at 32-33.

and anhedonia.³  (Tr. 442.)  Dr. McLemore opined that Oliveira had impaired concentration, poor activities of daily living, poor ability for self motivation, lack of ability to structure self, and was "unable to function at work or at home at [that] time."  (Tr. 443.)

Dr. David Jarrett treated Oliveira from April 2002 until August 2003.⁴  (Tr. 481-89.)  During an April 9, 2002 psychiatric mental status examination, Oliveira reported anxiety, increased appetite, depression, poor concentration and attention, and stress.  (Tr. 485.)  Dr. Jarrett indicated that her mood was depressed, pessimistic, hopeless, and anxious and that her insight was minimally impaired; however, he noted no problems with her attention or memory, logical relevant thought content, adequate impulse control, and sound judgment.⁵  (Tr. 488.)  Dr. Jarrett indicated a diagnosis code for Oliveira of 296.30, which the Commissioner states indicates major depressive disorder.  He further assessed a current GAF score of 40 and her highest GAF for the past year was 45.  (Id.)  Dr. Jarrett continued to treat Oliveira through August 2003.  His treatment notes are difficult to read, but they appear to indicate that during this time Oliveira had low energy; could not get up in the mornings; was sweaty; experienced abuse from her husband and obtained a restraining order; referred to Adderall as a "miracle drug" and then quit taking it; became manic, spent money, and was in debt; and felt depressed.  (Tr. 482-84.)

---

³ Anhedonia is defined as "[l]ack of pleasure in acts that are normally pleasurable."  Taber's Cyclopedic Medical Dictionary 123 (20th ed. 2005).

⁴ The court observes that Dr. Jarrett's treatment records were presented for the first time to the Appeals Council.

⁵ Oliveira alleges that Dr. Jarrett found that Oliveira was suicidal; however, his notes appear to state "Felt suicidal in Aug 01 & also in 1999[,] not now" and he circled the statement that "Patient Denies Thought, plan or Intent."  (Tr. 485.)  Oliveira also argues that Dr. Jarrett found that she had minimal insight and was severely impaired in this regard; however, it appears that for the category labeled "Insight," while Dr. Jarrett indicated that her insight was impaired, he circled "minimal" as opposed to "moderate" or "severe."  (Tr. 488.)

From October 2003 through May 2005, Oliveira received treatment from Little River Medical Center. The majority of these records indicate that Oliveira was doing fairly well with occasional adjustments in her medications. (Tr. 393-406.)

Oliveira began receiving treatment from Dr. Zaundra Jones in June 2005. (Tr. 480.) Dr. Jones noted that Oliveira spoke fast and diagnosed hypertension, ADD, anxiety/depression, and obesity. In early 2006, Oliveira reported mood swings, depression, and feeling overwhelmed; Dr. Jones diagnosed probable bipolar disorder. (Tr. 473, 472, 309-10.) In May 2006, Oliveira reported that she stopped taking her medications for ADD, anxiety, and probable bipolar disorder. (Tr. 308.) In June 2006, treatment notes reflect that Oliveira wrecked her car, and was experiencing increased family arguments, increased spending sprees, and an overdrawn checking account. Dr. Jones prescribed lithium to treat the probable bipolar disorder. (Tr. 305.) Later that month, Oliveira stopped taking the lithium because she "felt drunk" and reported that her parents were trying to have her committed. (Tr. 304.) Dr. Jones also indicated that she agreed that Oliveira should apply for disability benefits but that she was not able to control her finances. (Tr. 303.) By letter dated August 14, 2006, Dr. Jones stated that Oliveira's medical problems included "hypertension, asthma and mental illnesses that include[] a recent diagnosis of bipolar disorder with psychosis." (Tr. 296.) Dr. Jones opined that Oliveira's "mental illness had been stable, but began to deteriorate over the past three months at such extremes that she has imaginary friends, suffers from hallucinations and has no insight into her actions/problems." (Id.) She also opined that Oliveira "has become incapacitated and unable to care for her self or her son." (Id.) However, in conclusion Dr. Jones requested assistance getting Oliveira treatment for her psychiatric disorder and indicated that "she could regain her life and start taking care of herself" with such treatment. (Id.)

Two days later, on August 16, 2006, Oliveira was sent to Conway Hospital after being evaluated by Waccamaw Mental Health in the emergency room for psychosis and delusions. (Tr. 271.) Dr. John Rogowski observed that Oliveira was bipolar and taking lithium and Topamax, but had "not been taking the medicine regularly." (Id.) Dr. Rogowski also noted Dr. Jones's August 14 letter and that "[t]he patient had an emergency admission initiated by Dr. Gibbs from the mental health center with a concern that the patient was having evidence of psychotic behavior with issues such as people from Australia were paying her bills and multiple police visits for rambling speech, loud music and yelling at other persons." (Id.) Oliveira denied most of these allegations. The records reveal that Waccamaw Mental Health "felt that she was a danger to herself because of her bipolar disorder" and that she was "admitted for further treatment until a psychiatric bed became available in Columbia." (Tr. 274.) The records further indicate that Oliveira remained stable during her hospital stay with no signs of depression and no suicidal or homicidal thoughts. (Id.) Eight days later, on August 24, 2006, she was discharged. (Id.) It appears that later that same day, she was admitted to the Medical University of South Carolina ("MUSC") Institute of Psychiatry and remained there until September 7, 2006. (Tr. 287.) At discharge, Dr. Stephen McLeod-Bryant diagnosed bipolar disorder and assigned Oliveira a GAF score of 60, which may indicate moderate symptoms and impairment. (Tr. 288); see also DSM-IV at 34. On September 18, 2006, Oliveira received treatment at Waccamaw Mental Health Center and was diagnosed with bipolar disorder and assigned a GAF of 70. (Tr. 291-92.)

Following her discharge from MUSC, Oliveira continued to receive treatment from Dr. Jones. (Tr. 295.) In October 2006, Dr. Jones noted that Oliveira's mood was appropriate and her bipolar disorder was stable. (Tr. 350.) In November, her mood was slightly depressed. (Tr. 349.) In December, Dr. M. Coleman at Waccamaw Mental Health Center noted that neither manic or

depressive symptoms nor suicidal or homicidal ideation were present, that Oliveira's thought processes were clear, and that she reported that her current medications were working well. (Tr. 317-19.)

In January 2007, Jeffrey Vidic, Ph.D., a state agency psychologist, completed a psychiatric review technique and mental residual functional capacity assessment indicating that Oliveira had moderate difficulties and limitations in certain areas. (Tr. 328-44.) Dr. Vidic opined that Oliveira could follow rules and remember simple, one-and-two-step instructions; attend to simple, repetitive tasks for two hours at a time; make simple work related decisions; respond to minor changes in work routine; and make simple plans, set simple goals, and avoid common workplace hazards. However, Dr. Vidic stated that she should not work with the public or in close coordination with others. (Tr. 344.) In February, March, and August 2007, Dr. Coleman stated that Oliveira was mentally stable on her current medications prescribed by Dr. Jones. (Tr. 357, 407.) Dr. Coleman also noted in March 2007 that Oliveira reported that she found a job working part-time at a flea market. (Id.)

From January 2007 through February 2009, Dr. Jones did not report any problems with Oliveira's bipolar disorder and continued to prescribe medications. (Tr. 415-17, 470-71.) On February 10, 2009, Dr. Jones completed a psychiatric review technique, opining that Oliveira met Listing 12.04 Affective Disorders, indicating the presence of both manic and depressive symptoms. (Tr. 456-68.) Dr. Jones also opined that Oliveira had moderate functional limitations in activities of daily living and marked limitations in maintaining social functioning and in concentration, persistence, or pace. (Tr. 466.)

**B.    Failure to Comply with Medical Advice**

   **1.    Social Security Ruling ("SSR") 82-59**

Oliveira first argues that the ALJ violated SSR 82-59 in determining that Oliveira has not been under a disability for purposes of Social Security benefits. This argument is based on Oliveira's contention that "[t]he ALJ found that the plaintiff was not disabled in large part because she failed to take her bipolar medication on a regular basis." (Pl.'s Br. at 1, ECF No. 13 at 2.)

The policy statement for SSR 82-59 provides: "An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." Oliveira asserts that based on an Appeals Council interpretation and case law, the existence of a psychiatric impairment, such as bipolar disorder, may constitute justifiable cause for Oliveira's failure to follow her prescribed medical treatment. Oliveira further argues that the ALJ's failure to consider this possibility constitutes reversible error. In response, the Commissioner contends that Oliveira's argument is misplaced because the ALJ did not find that Oliveira was not disabled because of her noncompliance; rather, the ALJ discounted her subjective complaints and one of her treating physician's opinions in part because, other than her period of noncompliance in 2006, Oliveira's condition was stable with proper medication and treatment.

In examining this issue, the court observes that a finding of noncompliance with treatment may preclude a finding of disability. See 20 C.F.R. §§ 404.1530, 416.930 ("If you do not follow the prescribed treatment without good reason, we will not find you disabled"); SSR 82-59, 1982 WL 31384, at *1 ("Individuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under

a disability"). However, when a disability determination is precluded on this basis, SSR 82-59 provides that there are circumstances under which "an individual's failure to follow prescribed treatment will be generally accepted as 'justifiable' and, therefore, such 'failure' would not preclude a finding of 'disability.' " While none of the circumstances listed in SSR 82-59 concern mental illness, courts have recognized that a mental impairment may constitute a justifiable excuse for noncompliance with psychiatric medications. See Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009).

In this case, the ALJ's opinion does not indicate that she would have found Oliveira disabled but for Oliveira's noncompliance. The ALJ's opinion does not reflect that she primarily relied on Oliveira's noncompliance with prescribed treatment in determining her residual functional capacity; rather, it shows that she relied on the fact that since Oliveira's alleged onset date Oliveira was routinely found to be stable with proper medication and treatment. In assessing Oliveira's credibility, the ALJ addressed the fact that Oliveira's mental condition required hospitalization in August 2006 due to her noncompliance with medication; however, the ALJ found that since that time the medical records revealed that "she was routinely found to have no symptoms of depression, mania or psychosis, and she denied suicidal/homicidal ideation and hallucinations." (Tr. 15.) Further, in evaluating Dr. Jones's opinion, the ALJ stated that Dr. Jones's treatment records indicated that Oliveira's condition was relatively stable before she stopped taking her medication in May 2006 and after her hospitalization in August 2006. (Id. At 17.) Accordingly, the court finds that the Oliveira has not shown that the ALJ relied on noncompliance as the basis for finding

Oliveira not disabled and cannot demonstrate that the ALJ violated SSR 82-59.[6]  See Copper v. Astrue, C/A No. PWG-08-2621, 2010 WL 3294691, *3 (D. Md. Aug. 19, 2010) (unpublished) (stating that "SSR 82-59 only applies where the ALJ has determined that an individual's impairments preclude him or her from engaging in substantial gainful activity, *i.e.*, an individual who would otherwise be found disabled under the Act" and does not apply in assessing a claimant's credibility pursuant to SSR 96-7p); cf. Ibarra v. Commissioner, 92 F. Supp. 2d 1084, 1087 (D. Or. 2000) ("The ALJ did not expressly purport to deny claimant benefits on the ground that she failed to follow prescribed treatment . . . but his comments . . . and his ultimate finding that claimant is not disabled, rest[ed], in significant part, on his expressed perception that her failure to follow a prescribed treatment caused her [bipolar] condition to be worse than it might otherwise be.").

## 2. Treating Physicians

Typically, the Social Security Administration accords greater weight to the opinion of treating medical sources because treating physicians are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, "the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*). Rather, a treating physician's opinion is evaluated and weighed "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record,

---

[6] Although Oliveira cannot demonstrate that the ALJ violated SSR 82-59, remand of this matter is nonetheless warranted for the ALJ to consider the treatment notes of Dr. Jarrett, which were presented for the first time to the Appeals Council. As more fully discussed below, based on Dr. Jarrett's notes and opinions, it is questionable whether substantial evidence supports the Commissioner's position that, other than Oliveira's period of noncompliance in 2006, her condition was stable with proper medication and treatment.

and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). In the face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such an opinion. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

In this case, Oliveira argues that the Commissioner erred in evaluating the opinions of her treating physicians, Drs. Jones, McLemore, and Jarrett. Further, although Oliveira concedes that Dr. Rockford is not a treating physician, she appears to argue that the ALJ erred in giving this opinion little weight as well.

The ALJ gave little weight to the opinions of Drs. McLemore and Rockford, finding that there was no compelling support for them.[7] Specifically, the ALJ found that these doctors only evaluated Oliveira on a few occasions and did not have an ongoing relationship with her. Further, the ALJ found that "although the claimant reported various depressive symptoms, she was found to be alert and oriented with an intact memory and no evidence of a thought disorder, delusions or hallucinations." (Tr. 17.) The ALJ also noted that the determination of whether a claimant is disabled is reserved for the Commissioner. In discounting Dr. Jones's opinion, the ALJ found that it was inconsistent with the medical evidence of record and outside of Dr. Jones's area of expertise, as she is a family doctor and not a mental health professional. Further, the ALJ observed that

---

[7] The court observes that the standard for evaluating medical opinions does not appear to require that there be "compelling support" for an opinion. Rather, the regulations provide that "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is *well-supported* by medically acceptable clinical and laboratory diagnostic techniques and is *not inconsistent* with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (emphasis added). If controlling weight is not given, then the ALJ is directed to apply the factors listed above to determine the appropriate weight. None of these factors requires compelling support. Id.; see also Mastro, 270 F.3d at 178 (stating that the ALJ may accord less than controlling weight to the opinion of a treating physician when presented with "persuasive contrary evidence").

Oliveira's condition was relatively stable until she stopped taking her medications in May 2006 and stabilized after she was released from the hospital in August 2006 and resumed her medication.

Upon thorough review of the record as a whole, the briefs of the parties, and the ALJ's opinion, the court cannot say that the ALJ's decision to discount these opinions is supported by substantial evidence. While some of the reasons and selective medical evidence relied on by the ALJ may support discounting the physicians' opinions, the Commissioner and the ALJ failed to address treatment notes that support these opinions. For example, with regard to the opinions of Drs. McLemore and Rockford, the ALJ found that "these records reveal that the claimant's mental condition was severe and she was assessed with a global assessment of functioning level of 45 to 50;" however, the ALJ stated that this condition "did not persist for 12 consecutive months as required by 20 CFR §404.1509 and §416.909," noting that by December 2001 Oliveira was reporting that she was definitely better and that the record failed to reveal any treatment from December 2001 until October 2003. (Tr. 15.) The court cannot say that this conclusion is supported by substantial evidence in light of Dr. Jarrett's records, which were not presented to the ALJ. While Oliveira may have reported she was better in December 2001, within four months, in April 2002, she was seeking treatment from Dr. Jarrett. At that time, Dr. Jarrett diagnosed her with major depressive disorder and assessed a current GAF score of 40 and her highest GAF for the past year was 45. (Tr. 488.) Dr. Jarrett treated Oliveira until August 2003. As summarized above, his treatment notes indicate that Dr. Jarrett found Oliveira's mood during this time to be depressed, pessimistic, hopeless, and anxious and that Oliveira reported that she had low energy; could not get up in the mornings; was sweaty; experienced abuse from her husband and obtained a restraining order; referred to Adderall as a "miracle drug" and then quit taking it; became manic, spent money, and was in debt; and felt depressed. (Tr. 482-84, 488.)

Further, contrary to the ALJ's statement that there is not evidence of any delusions or hallucinations, Dr. McLemore's mental status examination appears to indicate that Oliveira displayed delusions, as well as suicidal ideation. (Tr. 262.) Later treatment notes also indicate continued suicidal thoughts, wishing that she and her baby would die. (Tr. 253); (see also Tr. 442-43 (describing Oliveira's impairments and limitations)). Although the ALJ may have pointed to some evidence that supports her decision to discount the opinions of Drs. McLemore and Rockford, the notes and records discussed above undermine the ALJ's reasons for discounting these opinions and the ALJ's determination that Oliveira was not under a disability during this time. At the very least, the failure of the Commissioner and the ALJ to address these records that appear to support these opinions prevents the court from determining that the ALJ's decision to discount these opinions is supported by substantial evidence and consistent with controlling law.

Moreover, as stated above, the court observes that the ALJ did not have the benefit of Dr. Jarrett's treatment notes. These records were submitted for the first time to the Appeals Council. On January 29, 2010, the Appeals Council denied Oliveira's request for review and with regard to Dr. Jarrett's notes stated:

> We also considered medical reports dated April 9, 2002 to August 12, 2003, from Dr. David Jarrett, which were submitted on August 4, 2009. The Council finds that this information does not provide a basis for changing the Administrative Law Judge's decision.[8]

(Tr. 2.) Such cursory review of Dr. Jarrett's treatment notes makes meaningful review of the Commissioner's conclusion difficult, especially in light of the ALJ's observation that the record failed to reveal any treatment from December 2001 until October 2003. While a low GAF score standing alone may not evidence that a claimant is unable to work, Dr. Jarrett's treatment notes

---

[8] The court observes that the Appeals Council provided no further discussion or explanation as to why this additional evidence did not provide a basis for changing the ALJ's decision.

arguably demonstrate that Oliveira was severely limited during this time and may be entitled to benefits. See Pate-Fires, 564 F.3d at 944 ("The history of GAF scores at 50 or below, taken as a whole, indicate [the claimant] has 'serious symptoms . . . or any serious impairment in social, occupational or school functioning. . . .'") (citing DSM-IV at 32) (alterations in original); Lee v. Barnhart, 117 Fed. Appx. 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work. . . . A GAF score of fifty or less, however, does suggest an inability to keep a job."). Therefore, without some explanation regarding the Commissioner's evaluation of Dr. Jarrett's treatment notes, the court cannot determine whether the Commissioner's statement that this information does not provide a basis for changing the ALJ's decision is supported by substantial evidence.[9] Moreover, these records also arguably provide support for the opinions of Drs. McLemore and Rockford, who both issued opinions indicating that Oliveira was severely limited within the previous fourteen months, as well as Dr. Jones's opinion, since those opinions were discounted in part because they were inconsistent with the medical evidence.

Accordingly, while the court may not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]," Craig, 76 F.3d at 589, the court is constrained to remand this issue for further explanation and review of these opinions.

**C.     Remaining Issues**

The reconsideration of these opinions may affect the ALJ's residual functional capacity analysis as well as his determination as to the subsequent steps of the sequential evaluation.

---

[9] The court expresses no opinion as to whether consideration of Dr. Jarrett's treatment notes in conjunction with the medical evidence already discussed by the ALJ should lead to a finding that Oliveira is entitled to disability benefits. Analysis of this additional evidence may well not affect the ALJ's conclusion. However, on this record, the court cannot say that the ALJ's conclusions are supported without such consideration.

Therefore, the court cannot determine whether the ALJ's conclusions as to the remainder of the sequential process are supported by substantial evidence. Further, the ALJ's reconsideration of the above issues may render Oliveira's remaining issues moot. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## RECOMMENDATION

Based on the foregoing, the court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further administrative action as set forth above.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

April 13, 2011
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).